Filed 10/31/23  P. v. Corder CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRIAN BOSEMAN CORDER et al.,<br><br>　　Defendants and Appellants. | B261370<br><br>(Los Angeles County<br>Super. Ct. No. PA073839) |

　　APPEAL from a judgment of the Superior Court of Los Angeles County, Dalila Corral Lyons, Judge.  Affirmed in part, reversed in part, and remanded with directions as to defendant Stephon Crutchfield.  Affirmed and remanded with directions as to defendants Brian Boseman Corder and Fredericka Carmouche.

　　John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Brian Boseman Corder.

　　Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Fredericka Carmouche.

Mark R. Yanis, under appointment by the Court of Appeal, for Defendant and Appellant Stephon Crutchfield.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Roberta L. Davis and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

This case involves charges against defendants and appellants Brian Boseman Corder, Fredericka Carmouche, and Stephon Crutchfield, based on an attack on Corder's wife, GiGi. In count 1, Corder and Carmouche were found guilty of conspiracy to commit murder.[1]  (Pen. Code, § 182, subd. (a)(1).)[2] All three defendants were found guilty of willful, deliberate, and premeditated attempted murder in count 2 (§§ 187, subd. (a), 664, subd. (a)), torture in count 4 (§ 206), and mayhem in count 5 (§ 205).[3]  Carmouche and Crutchfield were convicted of burglary in count 3.[4]  (§ 459.)  The jury also found true the allegations that Carmouche and Crutchfield personally inflicted great bodily

---

[1] Crutchfield was found not guilty in count 1.

[2] All statutory references are to the Penal Code unless otherwise specified.

[3] Defendants were found not guilty of aggravated mayhem in count 5, but were convicted of the lesser offense of mayhem.

[4] The burglary charge against Corder in count 3 was dismissed pursuant to a section 995 motion.

injury on the victim (§ 12022.7, subd. (a)), and that Carmouche personally used dangerous and deadly weapons within the meaning of section 12022, subdivision (b)(1), in counts 2 and 3.[5]

The trial court sentenced Corder to 25 years to life in count 1, and imposed and stayed sentences pursuant to section 654 in counts 2, 4, and 5. Carmouche was also sentenced to 25 years to life in count 1, with the sentences in counts 2–5 and the section 12022, subdivision (b)(1), and section 12022.7, subdivision (a) enhancements imposed and stayed under section 654. Crutchfield was sentenced to life in prison in count 2, plus three years for personal infliction of great bodily injury, with sentences imposed and stayed under section 654 in counts 3–5.

On appeal, all three defendants contended that the trial court erred in allowing the jury to consider a natural and probable consequences theory of aiding and abetting the attempted premeditated murder in count 2, and in refusing to require the victim to review documents that she stated would not help refresh her memory. Corder and Carmouche further contended that: (1) the trial court erred in failing to sua sponte instruct on lesser included offenses of conspiracy to commit murder; (2) the trial court erred in allowing the jury to consider both an act subsequent to the target offense and the agreement itself as overt acts in furtherance of conspiracy to commit murder; (3) their convictions for torture were not supported by substantial evidence; and (4) they were prejudiced by cumulative errors at trial. Finally, Corder separately contended the trial court erred in prohibiting a defense witness from testifying in his Marine Corps uniform, and in excluding evidence that Corder

_____

[5] The jury found not true allegations that Crutchfield personally used a dangerous and deadly weapon.

3

suffered from posttraumatic stress disorder (PTSD).[6]  We affirmed the convictions.  (*People v. Corder* (Dec. 19, 2016, B261370) [nonpub. opn.].)

Defendants petitioned for review arguing that their convictions for attempted murder on a natural and probable consequences theory were prohibited by the United States Supreme Court's opinion in *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*) and our Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).  Our Supreme Court granted review but deferred briefing pending consideration and disposition of *People v. Mateo*, S232674 (*Mateo*) or further order of the court.  (S239594, Mar. 22, 2017.)

On April 10, 2019, after Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1(f), p. 6674) (Senate Bill 1437) went into effect, the Supreme Court transferred the matter back to this court with directions to vacate our decision and reconsider the case in light of Senate Bill 1437.

We vacated our December 19, 2016 opinion and issued a revised opinion addressing all of defendants' arguments, including their new arguments relating to Senate Bill 1437.  We again affirmed the trial court's judgment.

Defendants again petitioned for review, this time arguing that Senate Bill 1437 applied to their convictions for attempted murder.  Our Supreme Court granted review but deferred

---

[6] In his opening brief, Corder joined in any contentions of his codefendants that accrued to his benefit.  (Cal. Rules of Court, rule 8.200(a)(5).)  Subsequent to filing her opening brief, Carmouche joined in several of the contentions listed above, providing additional argument by letter, filed with the court on May 17, 2016.

briefing pending consideration and disposition of a related issue in *People v. Lopez*, S258175, or further order of the court.

On December 22, 2021, the Supreme Court transferred the matter back to this court with directions to vacate our decision and reconsider the case in light of Senate Bill No. 775 (Stats. 2021, ch. 551, § 2) (Senate Bill 775), which became effective on January 1, 2022.

We vacated our November 20, 2019 opinion, and issued a revised opinion addressing all of defendants' arguments, including their new arguments relating to Senate Bill 775 and recently enacted Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) (Assembly Bill 518), which defendants briefed as permitted under California Rules of Court, rule 8.200. We remanded the matter as to all defendants for the limited purpose of allowing the trial court to determine whether to exercise its discretion under Assembly Bill 518, but otherwise affirmed the trial court's judgment.

Defendants petitioned for review a third time. Our Supreme Court denied review as to Corder and Carmouche, but granted Crutchfield's petition for review. The Supreme Court deferred further action in the matter pending consideration and disposition of a related issue in *In re Lopez*, S258912 or further order of the court.

On May 31, 2023, the Supreme Court transferred the matter back to this court with directions to vacate our decision and reconsider the cause in light of its decision in *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*). We have vacated our April 14, 2022 opinion, and now issue this revised opinion addressing all of

5

defendants' arguments, including their new arguments relating to *Lopez*.[7]

Crutchfield's conviction for willful, deliberate, and premeditated attempted murder in count 2 is reversed and the associated personal infliction of great bodily harm enhancement is vacated. The cause is remanded to the trial court to allow the prosecution to retry Crutchfield on a legally valid theory if it so elects. The trial court's judgment is otherwise affirmed.

We affirm the judgment as to Corder and Carmouche, but remand for the limited purpose of allowing the trial court to determine whether to exercise its discretion under Assembly Bill 518 as to each.

## FACTS

*Prosecution*

### GiGi and Corder's Relationship

GiGi, the victim, had been married to Corder for about six years at the time of the charged offenses. GiGi lived in an apartment in Canoga Park. Corder was an active duty member of the Marine Corps, stationed in San Pedro. Corder came home when he could.

---

[7] It is unclear whether the Supreme Court intends for this court to consider the impact of *Lopez* with respect to Corder and Carmouche, whose petitions for review it denied. However, in light of the Supreme Court's order to vacate the opinion and issue a new opinion, we have done so in an abundance of caution.

6

GiGi and Corder had a rocky, sometimes violent, marriage. Corder tackled and punched GiGi once when she confronted him about emails he had sent to other women. GiGi's mother witnessed Corder straddling GiGi and punching her in the face. Corder tried to kill both himself and GiGi once by repeatedly turning off the car engine on a freeway, and then zigzagging between lanes. Corder threatened GiGi in their frequent arguments, saying things like: "Bitch, I'm done with you, I'm fucking going to kill you," and "You're fucking not going to wake up tomorrow morning. You're dead tonight." Corder told GiGi he would end up in jail for hurting her. GiGi admitted responsibility for some of the violence. She once hit Corder with a broom after he verbally abused her.

In March 2012, GiGi told Corder she was pregnant. Corder was irate. He told GiGi, "This is bad. This is all bad. This is going to kill us." He also said, "Oh, my God, you need to have an abortion. We can't have this baby. This will kill us." He sent GiGi text messages threatening her and telling her to get an abortion. Corder threatened to stop paying the rent and the bills when GiGi told him that she would not get an abortion. They began receiving "three day" notices because Corder had not paid the rent. GiGi called Corder's commanding officer and informed him that Corder had threatened her, pressured her to have an abortion, and stopped paying their bills. Corder's attitude changed completely after the call. He apologized.

**The Attack**

On June 15, 2012, GiGi was four months pregnant and suffering from severe nausea. She contacted Corder that

morning, asking him to come home and help her. He said that he would come as soon as he could, but he did not return. GiGi continued to text and call him throughout the day, becoming very angry. She texted Corder: "If you don't come back and make this right, you will regret it, I promise you."

Someone pounded on the front door of GiGi's apartment around 10:00 o'clock that evening. GiGi went to see who it was and saw a finger covering the peephole, something Corder would often do, so she unlocked the door. She went back to bed, thinking that Corder heard her unlocking it and would come in. Instead, she heard the door close. She texted Corder, "Where are you? Did you just come and leave? What happened?" Corder eventually called GiGi and told her he had not been at the door. He said he was at school and would be back soon.[8]

Around midnight, GiGi heard someone throwing rocks at her patio doors, something Corder would do when he forgot his keys. She turned on the outside light and saw Corder, who waved at her. GiGi turned off the light and went to open the front door for Corder. She was naked because she had just thrown up on her clothing.

When GiGi opened the door, Crutchfield burst through and tackled her to the ground "like a linebacker." He straddled GiGi and punched her in the face relentlessly. GiGi fought back. She screamed for help. She screamed that she was pregnant, and called Corder's name. She thought Crutchfield was going to rape her.

Carmouche came into the apartment behind Crutchfield. She rummaged through the kitchen cabinets, pulling out various

_____

[8] Corder attended the Los Angeles Film and Recording School.

8

objects, including candelabras, a Pyrex dish, and a frying pan, which she then used to hit GiGi on the head. GiGi was in terrible pain. She was afraid for her life and for her baby. Crutchfield continued to punch GiGi on her face and chest while Carmouche hit GiGi's head. GiGi screamed, "My husband's coming. I'm pregnant. Help me." Someone responded, "Your husband's not coming, bitch." GiGi screamed and begged for help throughout the attack. One of her attackers said, "The bitch won't die." As this was happening, GiGi saw Corder sitting on the bed. She only saw his legs, but she was certain it was Corder. GiGi was hit in the face with a frying pan and lost two teeth. She believed that both Corder and Carmouche hit her with the frying pan at different times during the attack.

Carmouche grabbed GiGi's neck and wrenched it so hard it went numb. Carmouche grabbed GiGi's face, tilted GiGi's head sideways, and sliced GiGi's throat repeatedly with pieces of a broken Pyrex dish. She stabbed GiGi's breasts. GiGi thought she was going to die, and that her attackers would not stop until they believed she was dead. She played dead to protect her baby. Carmouche covered GiGi's nose and mouth with her hands until GiGi passed out.

When GiGi regained consciousness, she was lying on her bedroom floor surrounded by broken glass. She crawled to the phone on the nightstand and called her mother for help. The call ended when someone hit GiGi over the head and she blacked out a second time.

GiGi's mother called 911 at 12:52 a.m. She told the dispatcher that her daughter had just called and was being attacked.

Kathy Aguirre was visiting her family in an apartment in the building where GiGi resided. She heard a very loud thump and a woman screaming for help. The woman also screamed that she was pregnant. Aguirre called the police at 12:41 a.m. They arrived soon afterward.

Jane Hankins, who also lived in the building, heard loud yelling, thumping, and glass breaking. A woman yelled, "Get out, get out, get out," at least 50 times. "It was very severe, emotional yelling." Hankins called 911 at 12:37 a.m. She told the dispatcher that someone was "just screaming their head off." After she hung up the phone, the door to GiGi's apartment slammed shut and Hankins heard someone sobbing.

The police called Hankins to get the security code for the building at 12:51 a.m. She could not remember the code, so she went to open the door. As she was going to the door, a man yelled, "Help. Somebody call 911." She thought the man was GiGi's husband or boyfriend.

Los Angeles Police Officer Jeffrey Johnson and his partner arrived at the apartment at around 12:40 a.m. The front door was partially open. GiGi was lying on the floor, covered in blood, with injuries to her head. Corder was tending to her. GiGi repeatedly asked about her phone and her dog. She did not answer the officers' questions. The officers observed red stains on the wall over GiGi's bed; her pillow; the nightstand; a folding knife and pink bowl on the nightstand; the carpeting, bedding, sliding glass door, and blinds; broken chair legs, one of which was found on the bed; a phone on the kitchen counter; a frying pan; a broken candelabra; a shoeprint in the kitchen; a fan; the exterior door knob; and outside of the apartment. There were broken fixtures and furniture, including a fan and a chair. There was

10

broken glass throughout the apartment. Broken teeth were discovered near the bed. It looked as if an "extreme struggle" had taken place.

Forensic Nurse Examiner Sandra Wilkinson examined GiGi at the Northridge Hospital emergency room on June 16, 2012. She observed numerous cuts on GiGi's body, linear abrasions on her back, blood smears on the soles of her feet, and two missing fingernails, which were likely defensive wounds. GiGi had multiple cuts on both hands, which also appeared to be defensive wounds. GiGi had subconjunctival hemorrhages consistent with strangulation, a deep incision beside her right eyebrow, bruising to the neck and jaw, and numerous shallow and deep incisions. She sustained a cut close to the right carotid artery, which could have been fatal had the carotid artery been severed. GiGi's lips were swollen; she had missing teeth, as well as a cut that created a total separation from her lip to her nose. There was a deep cut on GiGi's right upper chest. Her entire body was smeared with blood.

**The Investigation**

*Interviews of GiGi*

Detective Rene January and her partner interviewed GiGi at 8:25 p.m. on June 16, 2012. The interview took place in the hospital, about an hour after GiGi was awoken from an induced coma. A breathing tube had just been removed from GiGi's throat, and she was having difficulty speaking. GiGi was still groggy and felt "drugged." She said she "didn't know right from left."

11

GiGi told the detectives Corder had been outside throwing pebbles at the sliding glass door. She did not know there were people waiting to attack her. She was "99.999 percent" certain Corder had not done this to her. She said a man and a woman attacked her. Both of them had cut her with sharp objects. The man and the woman were hurting her simultaneously at one point in the attack.

Later, GiGi's mother asked her what had happened. GiGi said three people came into her apartment. Two of the people were strangers, but she thought the third person was Corder. Her vision was blurred, so she could not be certain. The female attacker kept saying, "Just die. Just die." GiGi thought the female attacker also said, "The bitch won't die. The bitch won't die." GiGi said she was naked when she was attacked.

GiGi's mother called the police to inform them that she was more alert and could remember additional details. Detective January conducted a second interview on June 18, 2012. Corder had been arrested by that time. GiGi told Detective January that Corder was sitting on the foot of the bed as her attackers were beating her. GiGi did not see Corder's face, but she had been married to him for years and knew his legs and pants.[9] She was certain Corder had been there.[10]

---

[9] Other witnesses had seen Corder wearing shorts. Hankins said that Corder was wearing shorts when he called out for someone to help GiGi. GiGi's mother said that Corder was wearing shorts with blood on them at the hospital.

[10] GiGi testified that at the time of the first interview she was having trouble accepting the fact her husband had done this to her. She had also originally told the police she put a robe on

12

GiGi described the man who attacked her as Black with a short afro and buggy eyes. She thought he might have had some hair on his chin. He was about five feet six inches, or five feet eight inches, and in his 20s or 30s. The female attacker was a thin Black woman with short straightened black or brown hair. She was about five feet six inches to five feet seven inches tall. The woman wore blue denim capri pants with a belt, gloves, a pink shirt with writing and glitter on it, and a denim jacket that was shorter than her pink shirt. GiGi said the woman was wearing latex gloves, which she felt on her face during the attack.

GiGi thought her husband was outside during the initial attack, because he had just thrown pebbles at the sliding glass door. She told her attackers that her husband was outside. They responded, "Your husband is not coming, bitch. Die, bitch, die." Once she was on the ground, the first male attacker was "[p]unching her furiously, like a maniac." GiGi remembered being hit with a skillet, a Pyrex dish, and five glass candelabras. The woman dropped the Pyrex dish on GiGi's head, and then picked up pieces of the glass. She grabbed GiGi's face, tilted her head sideways, and tried to slit her throat repeatedly. She looked GiGi in the eyes and stabbed her breasts.[11]

before answering the door because she was embarrassed about being naked.

[11] GiGi inconsistently stated that the female attacker only beat her on her head and cut her throat.

13

*Interview of Corder*

Los Angeles Police Detectives Maria Dingman and Macchiarella spoke to Corder at Northridge Hospital on June 16. Corder said he had last spoken to GiGi at about 11:00 p.m. Corder went from the Marine base to his father's home, and then attended a class from 8:30 p.m. to 11:30 p.m. He arrived at the apartment at about 12:15 a.m.

During the interview, Detective Macchiarella viewed text messages on Corder's telephone. He asked Corder to show him a text message from "Fame."[12] Corder said he deleted it.

*Interview of Crutchfield*

Detective Richard Moakley interviewed Crutchfield on June 16. Crutchfield said he had been at school for a morning class and spent the rest of the day with a friend. He did not mention going to GiGi's apartment.

*Carmouche and Corder's Medical Examinations*

Dr. William Jou treated Carmouche at the emergency room at Kaiser Panorama City Medical Center around 1:00 p.m. on June 16. Carmouche said she had cut her knee and hands when she fell on broken glass approximately 11 hours earlier.

---

[12] "Fame" was a name used by Crutchfield.

14

Nurse Wilkinson examined Corder on June 16. She noted that there was blood on his hands, fingernails, and penis. He had superficial cuts.

*The Relationship of the Three Defendants*

Corder met Carmouche and Crutchfield at the Los Angeles Film and Recording School in Hollywood, which they all attended. On April 17, 2012, Carmouche texted Corder, "Morn, Lovely. Yes, I have been drawn to you since day one. We should def get together soon and chill. I have a good feeling about you . . . ." On May 4, 2012, Carmouche texted, "What are your turn-ons?" Corder replied, "Sexy outfits and touching, i.e., massages, oral, et cetera. All relaxing things like that." Carmouche sent texts to various people indicating that she and Corder were in a romantic relationship. On June 11, 2012, Carmouche texted Crutchfield that she loved Corder and would do "dumb shit" for him. On June 13, 2012, she texted Corder, "Believe no matter what I will take care and protect you" and "I wld do everything for you." Carmouche texted a friend the same night, threatening to kill the friend if he interfered with her relationship with Corder. She texted, "Yes tht was a threat. I love Brian. Nothing will keep me from him. If u r willing to wrk around tht, then we are fine." Carmouche texted Crutchfield around noon on June 16, 2012, "We're so close and I really do love Brian. I have never actually loved any man before and for me to do dumb shit."

On June 7, 2012, approximately a week before the attempted murder, Carmouche texted Corder complaining about a physical altercation she had with her mother's boyfriend that left a blood stain on the carpet. Carmouche texted: " 'I don't

15

know what to do.  I hurt him pretty bad.  I've been trying to get the smell of blood off my hands for 2 hours.  I am disturbed as fuck.' "  Corder responded, " 'Just soak ur hands in warm water and peroxide for about 5 minutes . . . . wash ur hands w/soap, then lotion them up.' " Carmouche replied, " 'Aaaaah, peroxide! Thats it.  Forgot I was talking to an expert here. . . .' "  Corder then texted, " '. . . and don't text shit like that . . . . I just deleted it . . . .' "

In texts on June 13, 2012, Carmouche told Corder that she planned to get a tattoo " 'for both of us to show U Im serious.' " She texted, " 'I want to commit myself to U regardless if U do or not Im just loyal like T-H.' " and "Seriously U need to wakeup and realize how I feel for you.  And my willingness to devote myself to you.' "

There were other text messages between the three defendants in the days before GiGi was attacked.

*Defendants' Whereabouts Prior to the Attack*

Records of the Los Angeles Film and Recording School indicated that all three defendants were enrolled, but that none had attended classes during the first week of June 2012.  They were later dropped from their courses.  On June 15, 2012, Corder's identification badge was used to enter the school at 8:32 p.m.  Still photographs from the school's surveillance cameras showed Corder entering the lobby at 10:03 p.m., and walking around inside the building at 10:36 p.m.  Corder's cell phone

records indicated that his phone was near the school at 10:00 p.m. and that his phone was used to call Crutchfield's phone.

Carmouche's cell phone records indicated that her phone was near GiGi's apartment at 10:08 p.m., 10:40 p.m., and 10:41 p.m. Crutchfield's phone records placed his phone near the film school at 11:26 p.m. and 11:30 p.m. In a deleted text Crutchfield sent to Corder at 11:31 p.m. on June 15, he wrote, "Outside." Video surveillance from the school showed Crutchfield entering the building at 11:32 p.m. The surveillance video showed Corder in the film school at 11:27 p.m., and leaving the building at 11:35 p.m.

*Defendants' Whereabouts and Communications*
*Following the Attack*

Cell phone records showed calls of 30-second duration between Carmouche and Crutchfield at 12:53 a.m. and 12:55 a.m. on July 16. Ten telephone calls were placed from Carmouche's phone between 12:53 a.m. and 1:51 a.m., including one to Crutchfield. Phone records showed that Crutchfield's phone was still in Canoga Park at 12:54 a.m.

Corder's phone received several text messages between 3:53 a.m. and 4:33 a.m., including a message from Crutchfield at 4:33 a.m. There was an 11-minute call between Corder and Crutchfield at 4:22 a.m.

*Physical Evidence*

On June 20, 2012, four swabs that showed a positive reaction for possible blood were collected from a 2005 silver

17

Jaguar. The Jaguar was owned by Corder's father and Corder drove it regularly. Also collected were swabs of possible biological material from the mouth of a water bottle, the mouth of a plastic bottle in the rear left foot space, the textured grip of an airsoft pistol found in the car, and the rear-facing edge of the front right backrest. Corder's clothing, including his boots, socks, green swimming trunks, and white plaid shorts, were collected for analysis.

Criminalist Monica Zielinski took swabs from the screen and keypad of the cell phone recovered from GiGi's kitchen counter for DNA testing. She also took a reference sample of GiGi's blood, and buccal swabs from Corder, Carmouche, and Crutchfield.

Criminalist King Chow sent samples from bloodstains from the rear center seat of Corder's car, the right seat, the interior right door, and the rear bumper; white, green and yellow shorts; gray and black Air Jordan shoes; a steel folding knife; and a frying pan for DNA testing. All of the items had reddish stains and a preliminary test for blood yielded positive results.

DNA analyst Stephanie Sivak initially received six items of evidence, including two swabs from the cell phone and the reference samples from GiGi and defendants. She later received four samples from stains in the Jaguar, two samples from red stains on a knife, two samples from red stains on a frying pan, one sample from a red stain on a pair of shorts, and one sample from a red stain on a right shoe. The red stain from the rear center seat of the Jaguar matched Carmouche's DNA profile. A stain from the front right seat contained a mixed profile, with Carmouche as the major contributor and GiGi as a minor contributor. The red stain on the rear bumper matched GiGi's

18

DNA profile. The red stain from the interior right door of the car and the stain on the shorts both matched Crutchfield's DNA profile. The stain from the handle of the frying pan matched Carmouche as the major DNA contributor and GiGi as the minor contributor. The red stains on the bottom of the frying pan matched GiGi's DNA profile. The red stain on the right shoe contained a mixture of DNA profiles, including GiGi's DNA profile as the major contributor and Carmouche's as the minor contributor.

On June 20, 2012, 29 fingerprints were lifted from the Jaguar. The prints from the outside of the trunk were Carmouche's fingerprints, prints from the inside of the passenger door were Crutchfield's, and prints from inside the driver's side front door pocket were Corder's.

A search of Carmouche's residence yielded a wig with reddish-brown hair, a pink tank top, and a pair of black jeans.

*Defense*[13]

### Crutchfield

A forensic print specialist testified that prints from the folding knife found in GiGi's apartment did not match Crutchfield's fingerprints.

Crutchfield's mother, his aunt, and the assistant principal from his high school testified to his good character.

Crutchfield testified on his own behalf. He met Corder and Carmouche in a class at the Los Angeles Film and Recording

_____

[13] Carmouche did not present testimony or evidence on her own behalf.

19

School. He believed Carmouche had a romantic interest in Corder, but the feeling was not mutual. Corder told Crutchfield that GiGi was mistreating him and hitting him. Corder and Crutchfield agreed that Crutchfield would scare GiGi so that Corder could "rescue" her. The plan was for Corder to throw stones at the patio doors so that GiGi would unlock the front door for Crutchfield to get inside the apartment. Corder said he thought he could make GiGi appreciate him more by playing the hero. Crutchfield knew GiGi was pregnant and believed that Corder wanted the baby.

Carmouche was not originally included in the plan to scare GiGi. Corder asked her if she wanted to participate on the night of the attack, and Carmouche agreed. Crutchfield and Carmouche did a "test run" that night to familiarize themselves with the building. Crutchfield covered the peephole on GiGi's apartment door with his finger so she would not see him.

After the test run, Carmouche and Crutchfield returned to the film school, where they had been earlier that evening, to meet Corder. Corder drove all three defendants to GiGi's apartment building. As Crutchfield and Carmouche were waiting for GiGi to open the apartment door, Crutchfield saw that Carmouche was carrying a folding knife, but he did not say anything about it to her. He also noticed that Carmouche was wearing gloves.

When GiGi opened the door, Crutchfield punched her, and she stumbled backward. He punched GiGi again and straddled her near her chest to avoid harming the baby, and then punched her several more times. In total, Crutchfield punched GiGi about six or seven times. He felt sick to his stomach because he did not like what he was doing.

Crutchfield heard Carmouche say, "Get her, get her." She also said, "Your husband is not coming, bitch." Crutchfield heard glass breaking several times. He fled when he was attacked by GiGi's dog. As Crutchfield left he saw Carmouche crouching by GiGi, but he could not see what Carmouche was doing.

Crutchfield and Carmouche left the apartment and ran to Corder's car, which was parked a few blocks away. The original plan was for Crutchfield and Carmouche to leave. Corder "was supposed to go to the apartment and rescue and be the hero." But Corder did not go to the apartment when Crutchfield was there. When they got back to the car, Corder was already there. He asked what happened to GiGi. Crutchfield said he did not know. Carmouche did not say anything.

Crutchfield did not want to kill GiGi. He never agreed to cut her neck. He thought he would help Corder's relationship with GiGi by roughing her up. The situation escalated when GiGi fought back.

Crutchfield denied saying " 'Die bitch.' " and " 'The bitch won't die.' ", but he remembered Carmouche saying " 'Die bitch.' " Crutchfield wondered why Carmouche said this because they were not planning to kill anyone, but he did not say anything to Carmouche about it. Crutchfield saw Carmouche crouching near GiGi as he was leaving. He testified, " 'I had to leave. I was like, 'This is going way too far. I gotta get out of here.' " Crutchfield never saw what Carmouche was doing.

**Corder**

Monda Fakhroo testified that she was visiting friends at the apartment building where GiGi lived on June 15 or 16, 2012.

21

Fakhroo saw a Black man jump over a fence.  The man asked if anyone heard his wife screaming.

Marine Sergeant Lonel Springs testified that he met Corder when they were stationed together at Camp Pendleton in 2005.  They served in Fallujah together.  On one occasion, Springs had seen GiGi hit Corder with a broom, which she held like a baseball bat.  Corder had a reputation for being level-headed, calm, cool, and collected.

## DISCUSSION

### *Conspiracy to Commit Murder*

" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' [Citations.]" (*People v. Johnson* (2013) 57 Cal.4th 250, 257 (*Johnson*).) "Conspiracy is a crime distinct from the substantive offense that is its object; it does not require commission of the substantive offense (target offense).  [Citations.]  The conspiratorial agreement is itself the essence of the crime, and is what it seeks to punish." (*People v. Cortez* (2018) 24 Cal.App.5th 807, 818.)

Corder and Carmouche make two challenges to their convictions for conspiracy to murder in count 1, which we discuss in turn.

22

**Lesser Included Offenses**

Corder and Carmouche first contend that their convictions for conspiracy to commit murder in count 1 must be reversed because the trial court failed to instruct on the lesser included offenses of conspiracy to commit assault, conspiracy to commit assault with a deadly weapon, and conspiracy to commit assault with force likely to produce great bodily injury.  We reject the contention.

*Law*

" ' " ' "[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]  That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]' " ' (*People v. Valdez* (2004) 32 Cal.4th 73, 115.)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1159 (*Banks*), abrogated on another ground by *People v. Scott* (2015) 61 Cal.4th 363.)

"The rule that juries must be instructed on lesser included offenses ' "prevents either party, whether by design or

inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.  Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' " ' (*People v. Smith* (2013) 57 Cal.4th 232, 239–240 (*Smith* ).)" (*Banks*, *supra*, 59 Cal.4th at pp. 1159–1160.)

" 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' (*People v. Souza* (2012) 54 Cal.4th 90, 113.) 'For purposes of determining a trial court's instructional duties, we have said that "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." ' (*Smith*, *supra*, 57 Cal.4th at p. 240, italics added.) When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' (*Id*. at p. 244.)  '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.' (*Ibid*.)" (*Banks*, *supra*, 59 Cal.4th at p. 1160.)

*Analysis*

Neither Corder nor Carmouche argues that conspiracy to commit assault, conspiracy to commit assault with a deadly

24

weapon, or conspiracy to commit assault with force likely to produce great bodily injury is a lesser included offense of conspiracy to murder under the elements test. The question then, is whether one of these crimes is a lesser included offense of conspiracy to murder under the accusatory pleading test. They argue that these offenses are lesser included offenses in light of Overt Act III, as alleged in the amended information, which states: "On June 16, 2012, Fredericka Carmouche and Stephon Crutchfield beat and stabbed GiGi C. using numerous weapons stating, 'The bitch won't die.' "

Case authority is split on the question of whether overt acts contained in the accusatory pleading should be considered when evaluating whether an offense is a lesser included offense of a conspiracy. In *People v. Cook* (2001) 91 Cal.App.4th 910, 918, the Third Appellate District concluded that "the trial court may look to the overt acts pleaded in a charge of conspiracy to determine whether the charged offense includes the lesser included offense." (*Id*. at p. 914.) There, defendants had been charged with conspiracy to commit murder, but the trial court also instructed the jury on a lesser included offense of conspiracy to commit assault with a firearm. On appeal, defendants claimed instruction on the lesser included offense was error. The overt acts alleged included that the conspirators acquired a firearm and that, in pursuit of the conspiracy, they shot and killed one victim and shot and wounded another. (*Id*. at p. 919 & fn. 22.) The appellate court observed that when murder is alleged to have been committed by means of a firearm, "it cannot be so committed without also committing an assault with a firearm." (*Id*. at p. 920.) The court concluded that "the jury must determine which felony the defendants conspired to commit, and

25

it cannot make that determination unless it is instructed on the elements of the target offense charged as well as the elements of any lesser included target offense which the jury could reasonably find to be the object of the conspiracy. [Citations.] Thus, the trial court has a sua sponte duty to instruct the jury on a lesser included target offense if there is substantial evidence from which the jury could find a conspiracy to commit the offense." (*Id*. at p. 918.) Because the overt acts alleged "necessarily include and gave notice of, the elements of assault with a firearm," the Court of Appeal held the trial court properly instructed the jury on the lesser target offense. (*Id*. at p. 920.)

On the other side of the appellate conflict is *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 47 Cal.App.4th 1167C, in which Division One of the First Appellate District held "in the context of deciding whether the trial court was obligated to instruct sua sponte on lesser included offenses, we conclude that allegations of overt acts committed in furtherance of the alleged conspiracy do not provide notice of lesser included target offenses." (*Id*. at p. 1708.) The reason for this is that, when the charged offense is conspiracy, "[i]t is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense." (*Id*. at p. 1709.) "In our view, it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy. Here, the information alleged only that defendants conspired to murder [the victim]. There is nothing in this terse description of the agreement to indicate an agreement with a lesser objective. We therefore hold that the trial court was not required to instruct the jury sua sponte on conspiracy to commit assault, battery, or

26

mayhem as lesser offenses included within the charged offense of conspiracy to commit murder." (*Id*. at p. 1709.)

In *People v. Cortez*, *supra*, 24 Cal.App.5th 807, Division Two of the Fourth Appellate District charted a middle course. The court agreed with *People v. Cook*, *supra*, 91 Cal.App.4th 910, to the extent that the alleged overt acts could be considered in determining whether the accusatory pleading encompasses an allegedly lesser included offense. (*Cortez, supra,* at p. 820.) However, the focus must nonetheless be on the conspirators' agreement, not the conspirators' acts. That is, the court should consider whether the overt act allegations "establish[ ] that the defendant has agreed or conspired to commit lesser included target offenses." (*Ibid*.) There is no duty to instruct on conspiracy to commit assault with a firearm as lesser to conspiracy to commit murder when "[t]he description of the conspiratorial agreement to commit murder cannot be fairly read to describe or encompass . . . conspiracy to commit assault with a firearm . . . ." (*Id*. at p. 821.) The court noted that even if the defendants actually committed an assault with a firearm, it did not change the original nature of their conspiracy, which was to commit murder, and it did not render assault with a firearm a necessarily included target offense of the conspiracy to commit murder. (*Ibid*.)

We agree with *Cortez* and *Fenenbock* to the extent they reason that the crime of conspiracy turns on the agreement, not the overt acts. If the alleged agreement was only to commit murder, it cannot be said that an agreement to commit assault, assault with a deadly weapon, or assault with force likely to produce great bodily injury is a lesser included offense. This is

27

true even when the overt acts may be consistent with a different, unalleged conspiracy.

Here, the information alleged that defendants "unlawfully conspire[d] together and with another person and persons whose identity is unknown to commit the crime of MURDER." Overt Act I—which defendants argue was not a valid overt act, as we will next discuss—stated: "On June 15, 2012, Brian Corder, Fredericka Carmouche and Stephon Crutchfield created a plan to kill Brian Corder's estranged wife, Gigi C." Conspiracy to commit assault, assault with a deadly weapon, and assault with force likely to produce great bodily injury are not necessarily included within these allegations.

We also reject Corder's and Carmouche's argument that the allegations of the attempted murder charge in count 2, which catalogued the deadly weapons allegedly used by Corder and Carmouche, inform the inquiry. Our Supreme Court has held that gun use enhancement allegations in an accusatory pleading could not be used to establish that assault with a deadly weapon was a lesser included offense of a charged robbery. (*People v. Wolcott* (1983) 34 Cal.3d 92, 100–102.) Following the Supreme Court's decision, appellate "courts have concluded that under the accusatory pleading test, gun use and great bodily injury enhancement allegations accompanying an attempted murder charge do not render assault with a deadly weapon a lesser included offense of the charged attempted murder. (*People v. Parks* (2004) 118 Cal.App.4th 1, 6; *People v. Richmond* (1991) 2 Cal.App.4th 610, 616.)" (*People v. Alarcon* (2012) 210 Cal.App.4th 432, 436.) The allegations contained in the attempted murder charge here are even more removed from the

28

conspiracy charge than an enhancement allegation, and we will not consider them.

Finally, we reject Corder's and Carmouche's argument that the trial court had a *sua sponte* duty to instruct on the alleged lesser included offenses solely because there was substantial evidence at trial (particularly the testimony of Crutchfield) that there was an agreement to scare and rough up Gigi: they argue such evidence was sufficient to support instructions on the lesser included offense. A trial court's *sua sponte* duty to instruct on lesser included offenses, however, is only triggered when the offense is *a lesser included offense* under the elements or accusatory pleading test *and* supported by sufficient evidence in the record. (See *Banks*, *supra*, 59 Cal.4th at p. 1160.)

For all of these reasons, we conclude that the trial court had no duty to instruct on conspiracy to commit assault, conspiracy to commit assault with a deadly weapon, or conspiracy to commit assault with force likely to produce great bodily injury as a lesser included offense of conspiracy to murder.

**Overt Acts**

Corder and Carmouche next contend that their convictions for conspiracy to commit murder must be reversed because two of the overt acts alleged to have been made in furtherance of the conspiracy to commit murder were invalid. They argue that it is impossible to know whether the jury's verdicts were based on proper overt acts because the jury is not legally required to unanimously agree regarding which overt acts have been

committed, and in this case the verdict forms did not indicate which acts formed the basis for the verdicts.

*Law*

A defendant cannot be convicted of conspiracy unless at least one overt act is alleged and proved by the prosecution; the existence of an agreement in the absence of an act done in furtherance of that agreement is insufficient to impose liability. (§ 184; *People v. Brown* (1991) 226 Cal.App.3d 1361, 1367 (*Brown*).) " ' "[A]n overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime." [Citations.]' [Citation.]" (*Johnson, supra*, 57 Cal.4th at p. 259.) An overt act must be performed before the commission of the offense that was the object of the conspiracy. (*Brown, supra*, 226 Cal.App.3d at p. 1369.) An act committed after the commission of the offense provides insufficient evidence to support a conviction. (*Id*. at pp. 1367–1370.) It is not necessary that each of the conspirators committed the overt act, or that the act be an element of a crime or an attempt to commit a crime. (*Id*. at p. 1369.) Although the jury must be in agreement that an overt act occurred, it is not required to agree as to the particular act committed. (*People v. Russo* (2001) 25 Cal.4th 1124, 1131, 1133.)

*Analysis*

Corder and Carmouche argue that Overt Act I—"On June 15, 2012, Brian Corder, Fredericka Carmouche and Stephon Crutchfield created a plan to kill Brian Corder's estranged wife,

30

Gigi C."—is not a valid overt act because it alleges only that defendants agreed to conspire, and that Overt Act V—"On June 15, 2012, Brian Corder drove Fredericka Carmouche and Stephon Crutchfield from the residence of Gigi C. after they attempted to kill her."—is not a valid overt act because the act took place after the attempted murder.

Even if we assume that the trial court erred by instructing the jury regarding these overt acts, any error is harmless beyond a reasonable doubt.[14] The jury convicted Corder and Carmouche of premeditated, willful, and deliberate attempted murder—i.e., the jury unanimously found that Corder and Carmouche attempted to commit the crime that was the object of the conspiracy. It is clear that the jury's guilty verdict with respect to attempted murder "effectively embraces" the issue of whether an act was completed in pursuance of the conspiracy (*People v. Chun* (2009) 45 Cal.4th 1172, 1204; see also *People v. Aledamat* (2019) 8 Cal.5th 1, 10 (*Aledamat*)), and demonstrates definitively that " ' "an outward act [was] done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime." [Citations.]' [Citation.]" (*Johnson, supra*, 57 Cal.4th at p. 259). The overt act requirement is satisfied by Corder and Carmouche's convictions of attempted

---

[14] No objection was raised in the trial court to these overt acts. The Attorney General did not argue Corder and Carmouche forfeited the issue, and we resolve it on grounds other than forfeiture.

murder. Any error in the instructions with respect to Overt Acts I and V was necessarily harmless.[15]

Corder and Carmouche argue that this court (which relied on the same reasoning in its previous, now-vacated opinions) improperly used their allegedly invalid convictions for conspiracy to commit murder and attempted murder to bolster one another in a circular fashion. Corder and Carmouche miscomprehend our reasoning. The issues are certainly intertwined, but the logic is not circular. As we will explain below, each conviction is supported by a valid jury finding that was necessary to the other conviction. Taken together, the jury's valid findings in connection with different elements of the two convictions satisfy the elements of both convictions beyond a reasonable doubt.

### *Attempted Premeditated Murder—Natural and Probable Consequences*

The jury convicted defendants of attempted willful, deliberate, and premeditated murder. The court instructed the jury that it could find defendants guilty of attempted murder as direct perpetrators, direct aiders and abettors, or as aiders and abettors under the natural and probable consequences doctrine.

---

[15] Carmouche's counsel expressly conceded in argument to the jury that there was no question the overt acts were committed. He also stated, "[Did Carmouche] inflict great bodily injury? [¶] Come on. Look at the pictures. I will not sit here and insult your intelligence and say she didn't. She did. No question about it." "The blood? . . . They went in there to rough her up. That should be no surprise." He also stated that Carmouche had "obviously" hit GiGi with a frying pan, as supported by the DNA evidence.

32

(CALCRIM Nos. 400 [Aiding and Abetting: General Principles]; 401 [Aiding and Abetting: Intended Crimes]; 403 [Natural and Probable Consequences]; and 600 [Attempted Murder].)

Following the Supreme Court's second transfer back to this court, defendants contended that we should vacate their attempted premeditated murder convictions pursuant to Senate Bill 775, which permits a defendant whose attempted murder conviction is not yet final to challenge on direct appeal the validity of that conviction based on the changes made to sections 188 and 189 by Senate Bill 1437. (§ 1172.6, subds. (a) & (g).)

The parties agree that, in light of Senate Bills 1437 and 775, the natural and probable consequences doctrine is no longer a valid theory of liability for attempted murder. Under current law, a jury must find the defendant acted with malice (for our purposes, intent to kill) before it may find a defendant guilty of attempted murder. The parties disagree only as to whether the error of instructing the jury on an invalid theory of liability, in addition to a valid theory, was harmless in this case. In our prior opinion, we concluded that any error was harmless with respect to all three defendants. We now reconsider our decision in light of the standard for harmless error that the Supreme Court recently articulated in *Lopez*, *supra*, 14 Cal.5th 562. We conclude that the error was harmless as to Corder and Carmouche, but not as to Crutchfield.

**Law**

Where, as the parties agree happened in this case, "a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has

occurred.  The defendant has been deprived of his or her right to 'a jury properly instructed in the relevant law.' [Citation.]  The error therefore requires reversal unless we determine the error was harmless beyond a reasonable doubt." (*Lopez, supra*, 14 Cal.5th at p. 580.)

In *Lopez, supra*, 14 Cal.5th 562, the defendant was convicted of first-degree premeditated murder after the jury was instructed on aiding and abetting under a natural and probable consequences theory of liability that had been held invalid in *Chiu, supra*, 59 Cal.4th 155.[16]  The Court of Appeal found the error harmless beyond a reasonable doubt in light of the Supreme Court's recent opinion in *Aledamat, supra*, 8 Cal.5th 1.  The appellate court based its decision on the jury's true finding on a "gang-murder special circumstance, which required the jury to find that an aider and abettor acted with intent to kill, and the 'overwhelming' evidence against [the defendant] more generally." (*Lopez*, at p. 567.)  The Supreme Court reversed, observing that "[t]he Court of Appeal discounted the prosecutor's discussion of

---

[16] *Chiu* held that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu, supra*, 59 Cal.4th at p. 167.)  Under *Chiu*, if the error could not be deemed harmless, the first degree murder conviction must be reversed and the prosecutor permitted to either retry the case and seek a first degree murder conviction under a direct aiding and abetting theory or accept a reduction of the conviction to second degree murder. (*Id.* at p. 168.)  *Chiu* was superseded by amendments to section 188 made through Senate Bill 1437, which abrogated the natural and probable consequences doctrine in full with respect to murder, attempted murder, and manslaughter. (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248–249 [murder]; § 1172.6, subd. (a) [attempted murder, manslaughter].)

the natural and probable consequences theory of first degree murder in his closing argument, and it found a jury note referencing that theory inconsequential under the circumstances." (*Id.* at pp. 567–568.)

In reversing the Court of Appeal, the Supreme Court elaborated: "In *Aledamat*, we explored the meaning of the harmless beyond a reasonable doubt standard in this circumstance involving alternative theories of liability. We noted that '[t]his harmless error rule applies in a variety of contexts, such as . . . error in omitting entirely one or more elements of a charged offense.' (*Aledamat, supra*, 8 Cal.5th at p. 9.) We held that the application of this standard for alternative-theory error should be consistent with, and not different from, the application of the same standard for other misdescriptions of the charged offense. (*Ibid.*) Specifically, we rejected the argument that alternative-theory error could be found harmless only where 'there is a basis in the record to find that "the jury has '*actually*' relied upon the valid theory." ' (*Ibid.*) Instead, a reviewing court may 'examine[ ] what the jury necessarily did find and ask[ ] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' (*Id.* at p. 15.) In other words, if ' "[n]o reasonable jury" ' would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence, the error may be found harmless beyond a reasonable doubt. (*Ibid.*)" (*Lopez, supra*, 14 Cal.5th at p. 580.)

The *Lopez* court further expounded, "This test is exacting, and it requires much of a reviewing court. '[S]afeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that

35

examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' [Citation.] 'A reviewing court making this harmless-error inquiry does not . . . "become in effect a second jury to determine whether the defendant is guilty." [Citation.] Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' (*Ibid.*)" (*Lopez, supra*, 14 Cal.5th at p. 581.)

### Corder and Carmouche

In our prior opinion, we held that any error in instructing on the natural and probable consequences doctrine with respect to the attempted murder charge was harmless as to Corder and Carmouche under *Aledamat, supra*, 8 Cal.5th 1. Our analysis and conclusion are unchanged.

"It has long been established that an alternative-theory error is harmless beyond a reasonable doubt where ' "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." ' (*Aledamat, supra*, 8 Cal.5th at p. 8.)" (*Lopez, supra*, 14 Cal.5th at pp. 585–586.) Here, the jury convicted Corder and Carmouche of conspiracy to commit murder in count 1. Defendants have not challenged the jury's intent to kill finding in connection with count 1, the conspiracy count, nor could they successfully do so. The instructions on the conspiracy to commit murder charge were

36

separate from the instructions on the attempted murder charge and materially different.  Notably, they contained no reference to the natural and probable consequences theory of accomplice liability.[17]

As instructed, the jury could not have found Corder and Carmouche guilty of conspiracy to commit murder and not also found that defendants intended to kill with respect to the attempted murder charge.  As our Supreme Court stated in *Lopez*, where the defendant has been convicted of conspiracy to commit murder there is " 'no possibility [defendants] were found guilty of [attempted] murder [of the same victim] on a natural and probable consequences theory.' " (*Lopez*, *supra*, 14 Cal.5th at p. 588.)  Corder and Carmouche were necessarily found guilty as either perpetrators of attempted murder, or as a perpetrator and a direct aider and abettor of attempted murder, both of which are still valid theories of guilt.  Any error in the trial court's

---

[17] The jury was instructed under CALCRIM No. 563 that to find a defendant guilty of conspiracy to murder it must find that the defendants "intended to agree and did agree with each other to intentionally and unlawfully kill."  The jury was further instructed under CALCRIM No. 520: "Defendants are charged with conspiracy to commit murder in count one.  This instruction defines the crime of murder for purposes of your verdict in count one.  [¶] . . . [¶] 1. The defendant intended to commit an act that would cause the death of another person; [¶] AND [¶] 2. When the defendant acted, he or she had a state of mind called malice aforethought.  [¶]  The defendant acted with *express malice* if he /she unlawfully intended to kill.  [¶]  *Malice aforethought* does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation of the passage of any particular period of time."

instruction of the jury on the additional, invalid natural and probable consequences theory was harmless beyond a reasonable doubt. Additionally, in light of our holding that Corder and Carmouche were properly convicted of attempted murder under a valid theory, it is not circular to hold harmless any instructional error with respect to the overt acts associated with the conspiracy to murder charge based on Corder and Carmouche's commission of the attempted murder.

### Crutchfield

Unlike Corder and Carmouche, the jury found Crutchfield not guilty of conspiracy to commit murder. As such, there is no express jury finding regarding Crutchfield's mental state that resolves the harmless error inquiry on the attempted murder count. Under *Lopez*, we must look beyond what the jury actually found and examine the record to determine " 'if ' "[n]o reasonable jury" ' would have found in favor of [Crutchfield] on the missing fact, given the jury's actual verdict and the state of the evidence' " before we may find the error harmless beyond a reasonable doubt. (*Lopez*, *supra*, 14 Cal.5th at p. 580.)

Here, Crutchfield testified that he agreed to rough Gigi up so that Corder could play the hero and regain her affection. He denied any intent to kill GiGi, and testified that when he realized it had gone too far he fled the apartment. Crutchfield's testimony that he sat on GiGi's chest rather than her stomach to protect the baby was consistent with GiGi's testimony regarding his positioning, and inconsistent with a finding that he intended to kill GiGi, as killing her would have endangered the baby's life. Crutchfield's testimony that he did not use any implements to hit

38

GiGi or cut her throat was also consistent with GiGi's account of events, and could support the inference that even if Carmouche intended to kill GiGi by attempting to cut her throat using broken glass, Crutchfield did not share that intent. Crutchfield testified that although he saw Carmouche crouching near GiGi as he left, he never saw her do anything to GiGi. Crutchfield has thus " 'contested the omitted element [of intent to kill] and raised evidence sufficient to support a contrary finding.' " (*Lopez, supra,* 14 Cal.5th at p. 581.) However unlikely we may find it, it is possible that a jury could find that Crutchfield entered GiGi's apartment with the intent to assault her with force likely to cause great bodily injury rather than with intent to kill.

Such a finding would not be inconsistent with the jury's findings that Corder and Carmouche conspired to murder GiGi. "A 'conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Kopp* (2019) 38 Cal.App.5th 47, 84.) Texts between Corder and Carmouche demonstrated that Corder knew Carmouche was violent and obsessively devoted to him. Crutchfield's testimony that Corder decided to include Carmouche at the last minute in what Corder told Crutchfield was just a plan to rough GiGi up combined with Carmouche's actions—bringing a knife and gloves to the apartment and gathering other deadly objects from the kitchen to use to hit and cut GiGi—support the reasonable inference that Corder and Carmouche conspired to commit murder and not assault, while leaving open the possibility that Crutchfield did not.

It is well established that "[w]hen there has been a postconviction change in the statutory or decisional law that

39

invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory." (*People v. Hola* (2022) 77 Cal.App.5th 362, 371.) Where a defendant's attempted murder conviction is reversed based on a direct appeal of the trial court's judgment under section 1172.6, subdivision (g), "the prosecution is entitled to retry him [or her] on that charge if it can *in good faith* advance a valid legal theory to support the conviction. [Citation.]" (See *id*. at p. 377 [reversing murder conviction and remanding to permit retrial].) Accordingly, we reverse Crutchfield's conviction for willful, deliberate, and premeditated attempted murder in count 2, vacate the associated personal infliction of great bodily injury enhancement (§ 12022.7, subd. (a)), and remand the matter to permit the prosecution the opportunity to retry Crutchfield on a legally valid theory.

### *Scope of Cross-Examination*

Crutchfield, joined with brief comment by Corder and Carmouche, argued that GiGi's refusal on three occasions while testifying to review certain documents because she believed the documents would not refresh her memory was a deliberate attempt to evade cross-examination in violation of the Sixth Amendment right to confront witnesses and Fourteenth Amendment right to due process. Crutchfield specifically contends that "[i]t was error to allow [GiGi] to refuse to look at a document and see if it would trigger her memory, and . . . it was error not to allow the defense to introduce that prior statement so the jury could evaluate whether it was true and whether GiGi

40

was being hostile to the defense, a fact which the jury could properly consider in evaluating her testimony."

GiGi's testimony covered approximately 327 pages of reporter's transcript. She was subjected to extensive cross-examination. The three instances disputed by defendants do not arguably result in a violation of their rights to confront and cross-examine a witness. Defendants also cannot establish prejudice, as a detective testified to GiGi's statements as to two of the disputed matters, and the detective was never questioned as to the third. The contention is entirely without merit.

**Proceedings**

During Crutchfield's cross-examination of GiGi, she answered numerous questions and reviewed documents five times to refresh her memory at counsel's request before she declined to review a document because it would not assist her recollection. Her memory was successfully refreshed twice. When questioned about her statements to police with respect to Crutchfield's knowledge of Carmouche's participation in the attack, GiGi stated that reviewing a transcript would not refresh her memory:

"[Crutchfield's counsel]: Didn't you previously tell the detectives that while Mr. Crutchfield was straddling you, beating you, he didn't know that Ms. Carmouche was hitting you over the head with items?

"[GiGi]: How would he not know? He's straddling me and she's hitting me in the head. That doesn't even make any sense.

"[Carmouche's counsel]: Objection. Nonresponsive. Motion to strike.

"The Court:  Sustained.  Stricken.

"[Crutchfield's counsel]:  Did you tell the detectives that, though?

"[GiGi]:  Not that I remember.

"[Crutchfield's counsel]:  Would it refresh your recollection to look at the --

"[GiGi]:  No.

"[Crutchfield's counsel]:  Your Honor, may I read the transcript to her?

"The Court:  No.  She said it would not help her refresh her recollection.  Go on to the next question."

Following this, Crutchfield's counsel asked GiGi whether reviewing documents would refresh her memory three more times, and she agreed that it might.  In two instances, reviewing the documents was helpful.  In another instance, counsel withdrew her question.  Counsel then questioned GiGi regarding whether she made statements to the police with respect to Corder:

"[Crutchfield's counsel]:  Three different occasions in the first interview with the detectives, you told them you were afraid and they better get [Corder] before he gets to and kills or hurts whoever did this to you?

"[GiGi]:  I don't remember that.

"[Crutchfield's counsel]:  Would it refresh your recollection?

"[GiGi]:  I don't remember.

"[Crutchfield's counsel]:  Would it refresh your recollection to look at the transcript?

"[GiGi]:  No.  No.

"The Court:  She said no.  Next question.

42

"[Crutchfield's counsel]: Is the Court going to allow me to impeach her with her statement?

"The Court: No, because she said she doesn't remember."

"[Crutchfield's counsel]: Did you tell the detectives on the first interview that you were 99.999 percent sure that it wasn't [Corder]?

"[GiGi]: I don't remember that. . . . [¶] . . . [¶] . . . [¶]

"[Crutchfield's counsel]: Would it refresh your recollection to review the transcript?

"[GiGi]: No, because I don't remember it."

Soon afterwards, the court recessed for the day. Out of the presence of the jury, the court reminded the defense that "I don't remember" was not necessarily an inconsistent statement that would open the door to impeachment.

The next day Crutchfield's cross-examination of GiGi continued. At sidebar, counsel expressed concern regarding whether she would be permitted to impeach GiGi with statements that GiGi could not remember making to police.

"[Crutchfield's counsel]: In light of GiGi's previous testimony, I don't want to be in a position where we're not allowed to impeach her with Detective January's testimony, based on a lot of things she said that she could not remember. She also did not even care to or agree to look at some of the defense documents in trying to refresh her recollection. She just won't look at it to see.

"The Court: Because she said if you presented such a document, that it would not refresh her recollection. [¶] She is not required to look at anything unless she says it would assist her in refreshing her recollection. If a witness says it will not help her refresh her recollection, that's it. [¶] So it is not that

43

she's refusing to look at the document. She said two or three times that looking at a document would not refresh her recollection.

"[Crutchfield's counsel]: And it is my perception, based on her previous testimony through the trial, that that's her position, saved just for the defense. [¶] I understand emotionally why she would not want to assist us, but she is not being that uncooperative with the [Deputy] District Attorney. I don't think there is a time where she will tell the [Deputy] D.A., 'no, it won't refresh my recollection.'

"The Court: You're speculating. There hasn't been a time where the [Deputy] District Attorney has asked her to refresh her recollection and she says whether it would help her or not. [¶] Did you ever ask her to refresh her recollection?

"[Prosecutor]: No. [¶] My understanding is she already stated she was super out of it and on drugs, and just came off a breathing tube during the first interview, and she doesn't remember what she told detectives, and counsel keeps asking her, and she doesn't remember.

"[Crutchfield's counsel]: So is it the court's position the court will allows us, for things she says she didn't remember and/or didn't remember and it wouldn't refresh her recollection to look at a document, will we be allowed to introduce her statements through the detective?

"The Court: You cannot impeach her unless there is an inconsistent statement. Her saying 'I don't remember' occasionally, based on what I have heard so far, it is not deliberately evasive. It is not intentionally trying to -- that is my opinion and my finding, that I do not find when she says 'I don't remember,' given the circumstances in this case, it is very clear to

44

me that she is not being deliberately evasive. [¶] So it is not -- 'I do not remember that word' does not necessarily equate to inconsistent. It does in certain cases. Not in this case."

After continuing discussion on the issue, the trial court reiterated: "I just want to make sure you're clear, [counsel]. [¶] At this point I do not find the witness is being deliberately evasive when she answers 'I don't remember' or 'I don't know.' I have not seen that at all. I have been watching her very clearly. [¶] In this case, more than any other, I have not seen any hint of that. She's very forthright. She does not appear to be intentionally falsifying the 'I don't knows,' or trying to avoid the answer."

**Law**

"The Sixth Amendment of the United States Constitution grants a criminal defendant the right to confront adverse witnesses." (*People v. Lopez* (2012) 55 Cal.4th 569, 573.) " 'Cross-examination may expose facts from which jurors can appropriately draw inferences about the reliability of a witness, including the possibility of bias. The trial court, however, has wide latitude to restrict such cross-examination, and such testimony is properly barred unless the defendant can show the prohibited cross-examination would have produced a significantly different impression of the witness's credibility.' (*People v. Brady* (2010) 50 Cal.4th 547, 560; see *People v. Smith* (2007) 40 Cal.4th 483, 513.)" (*People v. Capistrano* (2014) 59 Cal.4th 830, 866.)

"The trial court has broad discretion under Evidence Code section 765 to exercise control over interrogation of witnesses and protect them from undue harassment or embarrassment. (*People*

*v. Tafoya* (2007) 42 Cal.4th 147, 175 [(*Tafoya*)]; [*People v.*] *Spence* [(2012)] 212 Cal.App.4th [478,] 517 [(*Spence*)].) On appeal, we apply the abuse of discretion standard in reviewing a trial court's exercise of its authority under Evidence Code section 765. (*Tafoya,* at p. 175; *Spence,* at p. 517.)" (*People v. Chenault* (2014) 227 Cal.App.4th 1503, 1514.)

Feigned memory loss does not implicate the constitutional right to cross-examine witnesses. "The circumstance of feigned memory loss is not parallel to an entire refusal to testify. The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness . . . . '[T]he traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness's demeanor satisfy . . . constitutional requirements.' (*United States v. Owens* [(1988)] 484 U.S. [554,] 560.) In the face of an asserted loss of memory, these protections 'will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.' (*Ibid.*)" (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420 (*Gunder*).)

**Analysis**

Based on the above authorities, we reach the following conclusions. First, GiGi was subject to constitutionally adequate cross-examination designed to demonstrate her bias and lack of recollection. After over 300 pages of examination in the reporter's transcript, we have no difficulty in finding compliance with the Sixth Amendment.

46

Second, even if GiGi feigned a lack of memory by refusing to attempt to refresh her recollection, defendants' constitutional rights were not violated. (*Gunder*, *supra*, 151 Cal.App.4th at p. 420.)

Third, defendants pointed to no precedent in support of their contention that the trial court must require a witness to review a document to refresh her memory after the witness has stated that such review will not be helpful. The trial court did not abuse its considerable discretion to control the mode of questioning when it ruled GiGi was not evasive in the few instances in which she declined to attempt to refresh her recollection.

Fourth, the jury was able to observe GiGi's demeanor when she testified that she could not remember what she said to the police. The jurors were able to make their own determination as to whether her answers were credible. The trial court instructed the jury pursuant to CALCRIM No. 226 to consider how well a witness could perceive the subject matter of her testimony, the ability of a witness to remember and describe what happened, the behavior of a witness while testifying, the attitude of a witness about the case and about testifying, and whether a witness made prior consistent or inconsistent statements. This instruction provided the jury with the necessary tools to assess GiGi's several refusals to consider refreshing her memory, and afford that conduct whatever weight it deserved.

Fifth, defendants cannot establish prejudice. (*People v. Byron* (2009) 170 Cal.App.4th 657, 676 [Confrontation Clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24]; see *People v. Ledesma* (2006) 39 Cal.4th 641, 709.) Detective January

47

specifically testified to the statements that were the subject of the last two unsuccessful requests to refresh GiGi's recollection, and the detective was not even asked about the first statement in dispute. The jury therefore heard testimony regarding two of the prior statements, and defendants made no attempt to bring out the third statement.

### *Evidence Supporting Torture Convictions*

Carmouche contended that there was insufficient evidence to support her conviction for torture because the evidence did not demonstrate that she intended to cause cruel or extreme pain or suffering for the purpose of revenge, extortion, persuasion, or any sadistic purpose. Corder joined in her contention, arguing that if the evidence was insufficient to support Carmouche's torture conviction, his conviction as an aider and abettor must also be reversed. Substantial evidence supports both convictions.

#### Law

In assessing a claim of insufficiency of evidence, the appellate court's task is to review "the whole record in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The federal standard of review is to the same effect: under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes

the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319–320.) Where substantial evidence supports the jury's finding, and other circumstances support a contrary finding, the jury's finding will not be reversed. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Section 206 provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain."

" 'Courts have interpreted intent to inflict "cruel" pain and suffering as intent to inflict extreme or severe pain.' (*People v. Burton* (2006) 143 Cal.App.4th 447, 452 [(*Burton*)].)" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426 (*Hamlin*).) " 'Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain.' (*Burton*, *supra*, 143 Cal.App.4th at p. 452.)" (*Hamlin*, *supra*, at p. 1426.) It is not necessary that the defendant cause prolonged pain, or intend to do so. (*Id.* at p. 1427.) "A jury may consider the severity of the wounds in determining whether defendant intended to torture. (*People v. Mincey* (1992) 2 Cal.4th 408, 432–433.)" (*Burton*, *supra*, at p. 452.) " '[A] jury may [also] infer intent to cause extreme pain from a defendant who focuses [her] attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim.' [Citation.]"

(*Hamlin*, *supra*, at pp. 1426–1427.)  Intent can be reasonably inferred when the defendant "deliberately strikes [her] victim on an area of the body that is already injured."  (*Id*. at p. 1430.) " '[S]carring and disfigurement constitute strong circumstantial evidence of intent to inflict severe pain and suffering.' (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1224.)" (*Burton*, *supra*, at p. 452.)

**Analysis**

Crutchfield rushed GiGi, punching her multiple times and knocking her to the floor.  Carmouche knew that Crutchfield had hit GiGi in the head and continued to do so, yet she attacked GiGi mercilessly, using various weapons to batter, bruise, stab, and slash GiGi's injured face and her breasts.  She focused her attack on these specific, vulnerable areas of the body, attacking repeatedly.  GiGi's wounds were severe.  She lost fingernails while trying to ward off her attackers.  Carmouche hit GiGi in the head with a frying pan, knocking out two of her teeth.  She sliced GiGi's neck numerous times and then covered her mouth and nose until she lost consciousness.  Following the attack, GiGi was placed in a medically induced coma, requiring a breathing tube.  Her face and neck were permanently scarred, as the jury recognized when it convicted defendants of mayhem. (See *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347 [mayhem requires a finding that the victim sustained "a permanent disfiguring injury"].)  These facts strongly support the jury's finding that Carmouche intended to torture GiGi.

We are not persuaded by the cases Carmouche relies upon to argue that torture requires more than the facts of this case

demonstrate. That there are other cases in which the injuries suffered were more severe and the acts committed even more horrifying is of no moment. "There is no question there are cases in which the acts of torture were more gruesome. However, '[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts.' (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)" (*People v. Odom* (2016) 244 Cal.App.4th 237, 248.) The facts of this case amply support a finding of intent to torture.

Finally, there was substantial evidence that Carmouche tortured GiGi "for the purpose of revenge, extortion, persuasion, or [another] sadistic purpose." (§ 206.) Evidence was presented that Carmouche was infatuated with Corder. She told him she would do anything to protect him. She told Crutchfield she would do "dumb shit" on Corder's behalf. GiGi was Corder's wife and was carrying his child. It would be reasonable for the jury to infer that Carmouche took sadistic pleasure in torturing and permanently disfiguring a perceived rival. Her concentration on GiGi's face and breasts in a way that permanently disfigured and scarred GiGi further corroborates this inference. In light of the facts, we conclude that Carmouche and Corder's torture convictions were supported by substantial evidence.

### *Witness Attire*

Corder next argued that the trial court abused its discretion by requiring a fellow Marine who testified on his behalf to appear in civilian clothing. Corder argued that his witness, Lonel Springs, was prevented from presenting himself in the best possible light, which would have increased his credibility

with the jury.  He asserted that as an on-duty Marine, Springs should have been permitted to wear his uniform.  We conclude that, even if the trial court abused its discretion, Corder's contention fails because he has not established prejudice.

**Proceedings**

At trial, the prosecution objected when Springs presented himself for testimony dressed in his Marine Corps uniform.  The prosecutor argued that, under Evidence Code section 352, it would be prejudicial to allow the witness to wear his uniform.  She asserted that Corder was attempting to use Springs's military service to bolster his credibility and sway the jury.

Corder's counsel responded that wearing the uniform would not be prejudicial:  "That's what he is.  So he is wearing his uniform.  Whatever the Marines' issue is, it is a Marines' issue.  It is not for this court to decide."

The court questioned Corder's counsel regarding the decision to have Springs wear his uniform:

"The Court:  Why is he wearing a uniform to testify in a civilian case?

"[Corder's counsel]:  I gave him the option of what he wanted.

"The Court:  Did you give him the option, or did you tell him to wear it?

"[Corder's counsel]:  I gave him the option.

"The Court:  Did he ask you whether he should wear it or not?

"[Corder's counsel]:  Yes.

"The Court:  And you said yes?

"[Corder's counsel]:  Yes."

The court ruled:  "Under [Evidence Code section] 352, I think that his wearing a uniform is, first of all, inappropriate in a civilian trial.  [¶]  Secondly, I agree with the People.  I think that it will -- it was worn, in my opinion, given especially what you just told me, to allegedly add credibility to his testimony, and the wearing of the uniform, I think, adds nothing to the nature of his testimony.  He allegedly witnessed an incident of domestic violence . . . in a private setting, not in an official capacity as a Marine.  Even if he did, this trial has nothing to do with his being a Marine.  [¶]  So I think it is more prejudicial than probative.  It would mislead the jury and it is not appropriate."

Corder's counsel stated that he would ask Springs whether it was a violation of Marine Corps policies or procedures to wear his uniform.  The court said that it did not know whether it was a violation or not, but noted that it was a violation for police to testify in their uniforms regarding a private matter.  Regardless, the court was not going to adjudicate matters of Marine Corps rules and procedures.  The court was concerned solely with the impact on testimony.

Corder's counsel responded:  "His whole testimony will take about five minutes, Your Honor.  If the uniform changes -- I will be surprised if that changes anybody's mind on the facts of the case."

Later, Corder's counsel reported that he had spoken with Springs, who said the Marines permitted Springs to testify in a uniform.  The trial court did not change its ruling.[18]

---

[18] Corder was allowed to address the court and stated, without any support, that Springs was on-duty and required to

Springs testified that he and Corder met in the Marines in 2005, when they were stationed at Camp Pendleton. They served in Fallujah together. Springs and his wife became friends with Corder and GiGi when they returned to the United States, and saw them daily from 2006 until 2010. Springs recounted an incident in which he witnessed GiGi hit Corder with a broom, swinging it as if it was a baseball bat. Corder did not retaliate. Springs had never seen Corder act violently toward GiGi. He had last seen Corder in 2010. Corder had a reputation in the Marines for being "calm, cool, and collective [*sic*]." He had "helped [Springs] with [his] temper."

Springs's testimony spanned four pages of transcript. None of the parties elected to cross-examine him.

**Analysis**

We see no reason to delve into the merits of the issue. Given the weight of the evidence in this case, the argument that it was prejudicial error to refuse to allow Springs to testify in uniform borders on the absurd.

Springs's testimony was very brief. The jury knew that Springs and Corder were Marines, and that Springs vouched for Corder's character. It was undisputed Corder and GiGi had a volatile relationship, and GiGi had testified to hitting Corder with the broom. Springs was not a percipient witness to the charged crimes. His testimony had nothing to do with the attack on GiGi or Corder's role in it. We see absolutely no possibility

---

wear a uniform. Although Corder mentions his statement, on appeal he does not argue that Springs was required to wear his uniform at the hearing.

Corder would have obtained a more favorable result had Springs testified in uniform.

### *Posttraumatic Stress Disorder Evidence*

Corder also contended that the trial court erred in ruling "that no mention could be made of PTSD, [and] opining that it was not a defense to any of the charges." He argued that trial counsel's failure to seek to have the PTSD evidence admitted on the ground that it supported a "diminished actuality" theory of defense—i.e., that Corder lacked the specific intent required to commit the charged crimes—was not forfeited because counsel was reacting defensively to "the pressure to state the relevance pre-trial [*sic*] and the court's assertion that there was no PTSD defense to any of the charges," and also because the argument was futile in light of the trial court's ruling.[19] Alternately, Corder argued he was prejudiced by counsel's ineffective assistance in failing to seek admission of PTSD evidence on this basis.

We disagree with Corder's characterization of the trial court's ruling, and conclude there is no merit to his claim that trial counsel was pressured into abstaining from making a futile argument. Nor can we agree that defendant has established ineffective assistance of counsel, as trial counsel was not given an

[19] "[PTSD] evidence is admissible for the sole purpose of showing . . . 'whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought, when a specific intent crime is charged' (§ 28, subd. (a)) . . . ." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908, italics omitted.)

opportunity to explain his strategic decisions on the record, and Corder fails to establish that it is reasonably probable that the outcome of the trial was negatively affected by counsel's tactical choice.

**Proceedings**

With respect to the trial court's ruling, the following colloquy took place at a pretrial hearing on the prosecution's motion to exclude mention of PTSD:

"The Court: The People are seeking to exclude any reference to defendant Corder has [*sic*] PTSD, or -- [Corder's counsel], are you going to introduce evidence of defendant having post-traumatic stress disorder?

"[Corder's counsel]: I may. I may, based on cross-examination of GiGi and what is developed at the trial. It may come in. I don't think the court can rule on that issue pretrial. I think it will have to rule as it is confronted during the trial.

"The Court: No. I need to know about it now. [¶] First of all, what is the relevance of his PTSD?

"[Corder's counsel]: Well, there's text messages that refer to GiGi saying 'My husband died in Fallouja [*sic*].' She texted that. [¶] I think that would be relevant based on those text messages that are going to come out. [¶] One of the prosecution's theories, as the court is well aware, is that Mr. Corder did not want the child, and therefore he decided that he was going to kill GiGi because of that. [¶] They had a series of text messages. . . . It lasted most of a particular day and maybe into a second day about two months before this incident in which GiGi expresses how upset she is with Mr. Corder, and Mr. Corder is explaining

56

his side of it, and in that, one of those text messages, she said 'My husband died in Fallouja [*sic*].' [¶] Well, what does that mean? I want to find out what that means.

"The Court: How is that relevant?

"[Corder's counsel]: It is relevant to explain what she's talking about there, that he has -- it is all part of the case, whether he has PTSD or not. We're not offering it as a defense or anything like that, but we're offering it as part of the facts of the case.

"The Court: [Prosecutor]? How is it relevant that the defendant had PTSD?

"[Prosecutor]: I just didn't want it coming out as some sort of a defense. If [Corder's counsel] is saying he just wants to question GiGi about the messages and what she meant . . . and basically referring to the fact that he came back a different person, I don't have an issue with that.

"The Court: Is that your intent?

"[Corder's counsel]: Yes. That's it.

"The Court: So you are going to introduce evidence asking GiGi to clarify the text message?

"[Corder's counsel]: Yes. That's all.

"The Court: You have no objection to that?

"[Prosecutor]: I don't have an issue with that. I just didn't want an expert at the last second talking about some type of psychological defense that I had never heard of.

"The Court: There is no such defense.

"[Corder's counsel]: There will be no expert coming in. I can represent that."

The trial court asked if either Carmouche or Crutchfield objected to admission of PTSD evidence on this limited basis.

57

Carmouche's counsel noted that there were many text messages and he would not know whether he would object until a specific issue arose. The trial court reiterated that the evidence would only be admitted in the limited context of the single text they had discussed. Corder's counsel stated, "Among other things, it may relate to the other issues that come up. But there is no expert evidence."

The court responded: "In addition to the expert evidence, I'm not allowing you to go into a detailed explanation of his PTSD condition. . . . I know the People are not objecting for you to probe into the clarification of the text messages that are going to be introduced, but we're not going to be sidetracked with regards to that medical condition." The court allowed the introduction of PTSD evidence for the limited purpose discussed.

**Analysis**

The record demonstrates that the court did not rule that all PTSD evidence was inadmissible, as Corder represents. The court allowed Corder to present evidence of his text message for the specific purpose mentioned by defense counsel. It is clear that Corder's counsel had no intention of presenting a diminished actuality defense on the basis of PTSD evidence, and was not pressured by the trial court in this regard. We view the trial court's statement that "[t]here is no such defense," and its prohibition on broader admission of the evidence as reassurance to the prosecution that Corder's counsel was not seeking to admit the PTSD evidence as a defense before trial, and would not be allowed to ambush the prosecution with the defense midtrial. Corder's counsel similarly reassured the prosecutor that he would

not be calling an expert witness to testify regarding PTSD. The trial court did not err in its statements, nor did it force counsel into a position where he could not comfortably press for admission on a diminished actuality theory prior to trial. We cannot conclude the court abused its discretion in ruling that the defense would not be allowed to present evidence of a defense that it expressly eschewed. (See *People v. Vieira* (2005) 35 Cal.4th 264, 292 ["A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion"].)

We reject Corder's contention that counsel was constitutionally ineffective. (*People v. Williams* (1998) 61 Cal.App.4th 649, 657.) To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was both deficient and prejudicial, i.e., that it is reasonably probable that counsel's unprofessional errors affected the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693–694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) "The Sixth Amendment guarantees competent representation by counsel for criminal defendants[, and reviewing courts] presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703, citing *Strickland v. Washington*, *supra*, 466 U.S. at p. 690; *People v. Freeman* (1994) 8 Cal.4th 450, 513.) If the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

On this record, we cannot conclude that counsel was ineffective for failing to seek admission of PTSD evidence to show that Corder lacked specific intent to commit the crimes. The record is silent as to the reason for counsel's tactical choice. We have no way of knowing whether counsel had Corder examined for PTSD and if an expert would have been willing to testify to his condition. There is simply no ground for concluding counsel's performance was deficient.

### *Cumulative Error*

Corder and Carmouche argue the errors alleged, even if not individually prejudicial, are prejudicial when taken together. There was no cumulative error, as any error was inconsequential. (See *People v. Hines* (1997) 15 Cal.4th 997, 1075.)

### *Assembly Bill No. 518*

Finally, in their supplemental briefing following transfer back from the Supreme Court, all three defendants argue that the cause must be remanded for the trial court to determine whether to exercise its discretion under Assembly Bill 518, which became effective on January 1, 2022, after defendants' last appeal. The People concede that Assembly Bill 518 applies to defendants' case retroactively, and we accept that concession.

Prior to Assembly Bill 518, section 654 provided that an act or omission punishable in different ways by different provisions of law could only be punished under the provision with the longest potential term of imprisonment. Assembly Bill 518 amended section 654 to give trial courts the authority to impose

punishment under any one of two or more provisions that permit punishment of the same act, but not more than one provision. (§ 654, subd. (a).)

In this case, all three defendants were convicted of multiple crimes arising out of the same acts. In accordance with the requirements of section 654 as it existed at the time of their sentencing hearings, the trial court imposed the longest possible sentence as to each defendant. We agree with the parties that Assembly Bill 518 applies retroactively to defendants' case, which is not yet final on appeal. (See e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 309 [holding new laws granting courts discretion to ameliorate punishment, even if that discretion is ultimately exercised only in "some cases," should be applied retroactively to " ' "every case to which it constitutionally could apply" ' "].)

With respect to Crutchfield, the matter will be remanded to permit the prosecution to retry the attempted murder charge and associated enhancement. The trial court may decide whether to exercise its discretion under Assembly Bill 518 at Crutchfield's resentencing hearing.

Corder and Carmouche are entitled to a limited remand to permit the trial court to determine whether to exercise its discretion under Assembly Bill 518 and section 654. On remand the trial court should conduct a hearing for each defendant, in the presence of the defendant, defendant's counsel, and the People to determine whether to exercise its discretion to modify the original sentence as to that defendant. If the court decides to exercise its newly authorized discretion to impose a term other than the term with the longest potential term of imprisonment, the court should proceed to resentence that defendant. If the

61

court decides not to exercise its discretion to impose a lesser sentence than that previously mandated, the prior sentence is to remain in effect, and the defendant need not be resentenced but should be remanded to continue serving the term previously imposed. (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1255; *People v. Buchalter* (2001) 26 Cal.4th 20, 35.)

## DISPOSITION

Crutchfield's conviction for willful, deliberate, and premeditated attempted murder in count 2 is reversed and the associated personal infliction of great bodily harm enhancement is vacated. The cause is remanded to the trial court to permit the prosecution to retry Crutchfield under a valid theory of liability if it so elects. The judgment is otherwise affirmed.

As to Corder and Carmouche, the judgment is affirmed. We remand for the limited purpose of allowing the trial court to determine whether to exercise its discretion under Assembly Bill 518 and section 654, and to proceed to resentence one or both of the defendants if it determines to exercise that discretion. If the trial court decides not to exercise its discretion to modify the original sentence as to an individual defendant, that sentence

will remain in effect, and the defendant need not be resentenced but should be remanded to continue serving the term previously imposed.

NOT TO BE PUBLISHED.


MOOR, J.


I concur:


RUBIN, P. J.

The People v. Brian Boseman Corder et al.
B261370


BAKER, J., Concurring in Part and Dissenting in Part


I join the majority's analysis and disposition in full with respect to defendant and appellant Stephon Crutchfield. I also agree with nearly all of the majority's rationale with respect to the other two defendants, Brian Corder and Fredericka Carmouche.

I respectfully dissent, however, from the majority's decision to resolve on the merits those two defendants' post-*Lopez* arguments.[1] Our Supreme Court did not grant those two defendants' petitions for review—it denied them. Thus, absent some clear, express direction from our Supreme Court regarding how we should proceed as to them (regrettably, there is none), I see no basis to reach their newly raised contentions.


BAKER, J.

---

[1]    *In re Lopez* (2023) 14 Cal.5th 562.